UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
FRANKFORT

CRIMINAL ACTION NO. 3:21-CR-00021-GFVT-EBA

UNITED STATES OF AMERICA,                                                           PLAINTIFF,

V.                   **REPORT AND RECOMMENDATION**

EDWARD LEONIDAS LEWIS,                                           DEFENDANT.

*** *** *** ***

### I. INTRODUCTION

Edward Leonidas Lewis seeks an order suppressing evidence obtained as a result of a search warrant, executed by law enforcement February 25, 2021. [R. 24]. He asserts that Detective W. Anthony Gatson, who applied for the search warrant, failed to include material information in his affidavit, and the warrant therefore lacks probable cause. The matter being fully briefed, and for the foregoing reasons, it is **RECOMMENDED** that the Defendant's Motion to Suppress [R. 24] be **DENIED**.

### II. FACTS & PROCEDURAL HISTORY

On February 25, 2021 at 3:18 P.M., a Franklin County District Court judge authorized a search warrant to be executed at the residence of Edward Leonidas Lewis based on the application and accompanying affidavit of Kentucky State Police (KSP) Detective W. Anthony Gatson. [R. 24-3]. According to Detective Gatson's affidavit ("Affidavit"), a United States Department of Homeland Security, Immigration and Customs Enforcement, Homeland Security Investigations (HSI) investigation identified Mr. Lewis as a person of interest. [R. 24-3 at pg. 4]. HSI Special Agent Brian Minnick requested assistance interviewing Mr. Lewis, whose residence was located

at 147 Meredith Avenue in Frankfort, Kentucky (hereinafter, "147 Meredith Avenue"). [*Id.*]. With Mr. Lewis' written permission, Detective Gatson and Forensic Examiner Jason Rollins performed a preliminary search, or "preview," of two electronic devices, a cell phone and laptop. Based on the results of the consensual search, Detective Gatson ceased the search, arrested Mr. Lewis, and applied for a search warrant.

On November 29, 2021, Mr. Lewis moved to suppress evidence seized during the February 25, 2021 search because the "Affidavit is completely lacking in probable cause" and the evidence was obtained pursuant to a warrant supported by an affidavit "contain[ing] false statements, material omissions, and/or misrepresentations." [R. 24-1 at pg. 14]. On the latter ground for suppression, Mr. Lewis also moved for a suppression hearing pursuant to *Franks v. Delaware*. 438 U.S. 154 (1978). The United States responded, asserting that the Affidavit did establish probable cause and that Mr. Lewis was not entitled to a *Franks* hearing. [R. 26-1]. The United States, however, also requested its own hearing on the motion. [*Id.*]. Accordingly, the Court set a hearing on the motion.[1]  [R. 30].

**A. Suppression Hearing**

The Court conducted the Suppression Hearing in this matter on January 4, 2022 in Lexington, Kentucky. The United States called three witnesses, all of whom participated in a "knock-and-talk" which preceded the consensual search: Detective Gatson, HSI Special Agents Brian Minnick and Brandon Even. Mr. Lewis did not call any additional witnesses.

Detective Gatson described his experience investigating child sex exploitation, including his knowledge of known series of exploitative materials that circulate the Dark Web and are often found in the possession of collectors of child pornography. His foray into the investigation of

---

[1] The Court originally scheduled the Suppression Hearing for December 21, 2021. [R. 27]. During a telephone conference, the Court became aware that counsel for Defendant had a potential exposure to the novel coronavirus (COVID-19). [R. 28]. Accordingly, the Court continued the hearing. [R. 29].

Mr. Lewis began when he received a lead from HSI regarding an Internet Protocol (IP) address that had accessed a website known to host child sex exploitative media. KSP subpoenaed the internet service provider, and the return yielded two addresses belonging to Mr. Lewis: first, a billing address located in Frankfort; and second, the service address at 147 Meredith Avenue. Detective Gatson, accompanied by Special Agents Minnick and Even, conducted a knock-and-talk at both addresses. At the first address, a young woman answered the door and informed them that Mr. Lewis did not live there.

Detective Gatson and Special Agents Minnick and Even proceeded to the second address, 147 Meredith Avenue, where Mr. Lewis answered the door. All witnesses testified that Detective Gatson informed Mr. Lewis that they were investigating allegations of child sex exploitation, and that a federal investigation identified his IP address as being of interest. Mr. Lewis freely let them enter his home and allegedly stated, "you're not going to find anything." Detective Gatson testified that he asked Mr. Lewis for consent to search his electronic devices. Indeed, Mr. Lewis provided such consent by signing a form (hereinafter, "Consent Form"), which stated as follows:

> I hereby consent to a complete search of the premises, property or vehicle located at 147 Meredith Ave Frankfort KY 40601 and more particularly described as Samsung Galaxy Note 9 HP Pavilion Laptop Model # 3165NGW S/N 5CD6223SP.
>
> I grant this consent to Det. W.A. Gatson known to me to be a Kentucky State Police officer, and to such other officers as he deems necessary to assist. I know that I have a right to refuse consent, and I voluntarily give up that right. I know that the officer does not have a search warrant. I have not been threatened or coerced in any way, nor have I been promised any favor or benefit. I have read this consent form, or it has been read to me, and I understand it.

[R. 26-2]. According to the form, it was executed at 12:40 P.M. on February 25, 2021. The validity of the form itself is uncontested.

After obtaining consent from Mr. Lewis, Detective Gatson testified that he called KSP Forensic Examiner Jason Rollins, who arrived at 147 Meredith Avenue approximately 20 minutes later. FE Rollins performed a "preview" of the two electronic devices listed on the Consent Form.

On the Samsung Galaxy Note 9, Mr. Lewis' cell phone, Detective Gatson observed thumbnails of young females bathing which were later revealed to be Mr. Lewis' underage family members.[2] In performing a preview of the laptop, FE Rollins ran an osTriage Report.[3] The report identified files that had been previously opened on the laptop and the accompanying file names.[4] After running the report, Detective Gatson testified that FE Rollins physically showed him the report on his computer screen and allowed Detective Gatson to examine the file names. Among the file names that Detective Gatson saw were names consistent with common child sex exploitation series: "Tara" and "PedoMom." Neither FE Rollins nor Detective Gatson opened any files or observed the contents of the files. However, upon recognizing the file names as being consistent with well-known child pornographic series, Detective Gatson testified that he ceased the search.

Detective Gatson then called an Assistant Commonwealth Attorney and explained the findings of the consensual search. In response, the Attorney advised him to cease the search, arrest Mr. Lewis, and obtain a search warrant. After the call, Mr. Lewis was placed under arrest and transported by a uniformed KSP officer to jail. It was at this point that Detective Gatson prepared the search warrant application, met with the Franklin County District Court judge, and the search was executed. Neither the record, nor testimony from the Suppression Hearing, indicate that Mr. Lewis ever withdrew or limited his consent to search as memorialized in the Consent Form.

### B. Detective Gatson's Affidavit & Search Warrant

The Affidavit itself is largely boilerplate language and, thus, is light on facts. After reciting his 26-year career in law enforcement and his experience investigating child sexual exploitation in

---

[2] A "thumbnail" is a small, electronic preview of a photo or video file.
[3] According to Detective Gatson, "osTriage" is a forensic tool used to search a computer's file and internet history. The tool generates a report listing the file names and/or internet addresses, called an osTriage Report.
[4] At the Suppression Hearing, the United States provided the osTriage Report FE Rollins ran during the consensual search. The report lists recent files accessed on the computer, and partial file names for those recently-accessed items.

the Commonwealth of Kentucky, Detective Gatson further provided:

> Mr. Lewis gave consent to search his laptop and cell phone. During [sic] search it became apparent that Mr. Lewis had used his laptop to view images of child sexual exploitation. The search based on consent was stopped and Mr. Lewis was arrested.
>
> Based on the affiant's knowledge, experience and training, Edward L. Lewis has demonstrated a pattern of criminal activity related to child pornography, and there is a reasonable likelihood that the user treats child pornography as a valuable commodity to be retained and collected, a character common to many people interested in child pornography. . . .

[R. 24-3 at pg. 4].

KSP and HSI agents executed the search warrant on February 25, 2021, wherein they seized several electronic devices, storage devices, and a firearm located at 147 Meredith Avenue.[5] On October 21, 2021, Mr. Lewis was indicted by a federal grand jury on seven counts related to producing, viewing, possessing, or transmitting materials depicting minors engaged in sexually explicit conduct. *See* [R. 1]. A grand jury issued a superseding indictment on November 18, 2021.

### III. STANDARD OF REVIEW

The Fourth Amendment protects against unreasonable searches and seizures. U.S. Const. amend. IV. In order for a search to be reasonable, law enforcement must generally obtain a warrant from a neutral and detached judicial officer. *Johnson v. United States*, 333 U.S. 10, 14 (1948). The warrant must also be supported by probable cause. *Id.* However, a search may also be conducted with the individual's consent. "While the Fourth and Fourteenth Amendments limit the circumstances under which the police can conduct a search, there is nothing constitutionally suspect in a person's voluntarily allowing a search." *Schneckloth v. Bustamonte*, 412 U.S. 218, 242–43 (1973). Moreover, "[t]he actual conduct of the search may be precisely the same as if the

---

[5] The warrant return included: Samsung Galaxy Note 9, HP Pavilion Laptop computer, Sandisk Cruzer 4GB flash drive, Sandisk 32GB flashdrive 3.0, Sandisk Cruzer 16 GB flash drive, Plug-to-Cam camera, Black USB Flash Drive, Plug to Cam Camera, Remington 870 12GA pump shotgun, Acer Aspire 5720Z series laptop, Toshiba 500GB hard drive, QNINE NVME Enclosure with USB-C, and Sandisk MicroSD card 512MB with adapter. [R. 33-4 at pg. 10].

Page **5** of **13**

police had obtained a warrant." *Id.* at 243.

"When evidence is obtained in violation of the Fourth Amendment, the judicially developed exclusionary rule usually precludes its use in a criminal proceeding against the victim of the illegal search and seizure." *Illinois v. Krull*, 480 U.S. 340, 347 (1987). A person who claims to have been aggrieved of a constitutional violation bears the initial burden of production and persuasion to suppress evidence. *United States v. Smith*, 783 F.2d 648, 650 (6th Cir. 1986). Once the defendant establishes a basis for his motion, the government then has the burden of demonstrating that there was not a constitutional violation. *See United States v. Bradley*, 163 Fed. App'x. 353, 357 (6th Cir. 2005) (citing *United States v. Matlock*, 415 U.S. 164, 177 n.14, (1974); *Colorado v. Connelly*, 479 U.S. 157, 168 (1986)). The controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence. *Matlock*, 415 U.S. at 177 n.14.

### IV. ANALYSIS

At the Suppression Hearing, the United States asserted that the Consent Form provides an independent basis for a valid search and seizure of all the items obtained pursuant to the search warrant. Indeed, a search may be valid under the Fourth Amendment if law enforcement had consent to perform the search. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973) ("[A] search authorized by consent is wholly valid.") (citing *Katz v. United States*, 389 U.S. 347, 357–58 (1967)). "Where the United States has obtained evidence pursuant to a consensual search, the United States bears the burden of demonstrating by a preponderance of the evidence, through 'clear and positive testimony,' . . . that the consent was voluntary, unequivocal, specific, intelligently given, and uncontaminated by duress or coercion." *United States v. Canipe*, 569 F.3d 597, 602 (6th Cir. 2009) (quoting *United States v. Worley*, 193 F.3d 380, 385 (6th Cir. 1999)). Even where an individual has provided voluntary and unequivocal consent, he may retract or limit that consent

at any time. *United States v. Buckingham*, 433 F.3d 508, 512 (6th Cir. 2006) (citing *Painter v. Robertson*, 185 F.3d 557, 567 (6th Cir. 1999)).

Whether the United States meets its burden to prove valid consent is "is a question of fact to be determined from the totality of all the circumstances," *Schneckloth*, 412 U.S. at 227. For instance, a defendant signing a consent to search form while detained—although not arrested—can weigh in favor of finding that the consent was not voluntarily given. *See United States v. Blackaby*, No. 17-5-DLB-EBA, 2018 U.S. Dist. LEXIS 22204, at *25 (E.D. Ky. Feb. 12, 2018). In *Blackaby*, police were investigating allegations of child abuse and obtained arrest warrants for the two defendants, Kelsey Blackaby and Kyle Ruark. *Id.* at *2. Upon arriving at the residence, the police did not inform defendants of the arrest warrants, but defendants were not free to leave. *Id.* Police asked for their identification, so defendants went to retrieve them from within the home. *Id.* at *3. The police officers followed them inside without permission. *Id.* Blackaby witnessed Ruark go into a back room and attempt to close the door on police before they could enter. *Id.* at *4. The officer prevented Ruark from doing so, forcibly entered the room, and subsequently arrested Ruark. Minutes later, and after witnessing Ruark being taken away in handcuffs, Blackaby signed a consent to search form.

In determining that Blackaby had been coerced into giving written consent, the Court evaluated the behavior of both defendants and police prior to Blackaby signing the consent form. Defendants did not invite the police into the residence and Ruark's immediate retreat to the back room and his attempt to close the door was an "unequivocal revocation of any consent [to be in the residence] that may have existed." *Id.* at *16. Further, the Court concluded that, "[t]he 'circumstances surrounding the search' and Blackaby's consent evince 'more subtle forms of coercion that might flaw an individual's judgment." *Id.* at *26–27 (quoting *United States v. Moon*,

513 F.3d 527, 537 (6th Cir. 2008)).

Considering the totality of circumstances, including the record and testimony presented at the Suppression Hearing, the undersigned finds that the United States met its burden to demonstrate that Mr. Lewis' consent was voluntary, intelligent, and unequivocally given. As a threshold matter, the Sixth Circuit has explicitly acknowledged that the knock-and-talk procedure utilized by law enforcement here "is a legitimate investigative technique aimed at achieving a suspect's consent to search." *United States v. Lucas*, 640 F.3d 168, 174 (6th Cir. 2011). Based on testimony from all three witnesses, Detective Gatson informed Mr. Lewis that the purpose of the knock-and-talk was to investigate an HSI lead related to child sex exploitation. With this knowledge, all witnesses testified that Mr. Lewis freely let them enter his home. They conversed while sitting in his living room. All the witnesses described Mr. Lewis as conversational, amiable, or cooperative throughout the entire encounter. Both Detective Gatson and Special Agent Even recalled that, during the encounter, Mr. Lewis excused himself to go to the restroom. Ultimately, Mr. Lewis signed the Consent Form while sitting in his living room with Detective Gatson and Special Agents Minnick and Even. Taken together, these facts do not evince coercion, subtle or otherwise. Moreover, the record does not reflect, nor does Mr. Lewis allege, that law enforcement orally or physically coerced Mr. Lewis into signing the Consent Form. Thus, the Court is satisfied that the United States has met its burden to show that Mr. Lewis' consent, as memorialized in the Consent Form, was given freely and unequivocally, as he was free to move around and, likewise, free to refuse consent or ask law enforcement to leave his home.

Although the United States established that Mr. Lewis knowingly, intelligently, and unequivocally gave consent to search, Mr. Lewis contends that the Consent Form cannot support the constitutionality of the search which occurred after Mr. Lewis was in police custody and Detective Gatson applied for a search warrant. During the Suppression Hearing, Mr. Lewis

opposed the validity of the consensual search because (1) the Consent Form did not give law enforcement permission to seize any property from Mr. Lewis' residence; and (2) the Consent Form was not valid after Mr. Lewis' arrest.

At the outset, Mr. Lewis' contention that the Consent Form fails to uphold the search and subsequent seizure of property at 147 Meredith Avenue does not comport with previous decisions by this Court. For instance, in *United States v. Stapleton*, No. 12-11-ART-(1), 2013 U.S. Dist. LEXIS 106667 (E.D. Ky. July 30, 2013), the Court upheld a search and seizure of Defendants property based on a consent form which only explicitly authorized the search of defendant's clinic, with no mention of the seizure of defendant's patient files. *Id.* at *23. There, the Court found defendant's semantic argument, that failure to include "seizure" in the consent form indicated the seizure was violative of the Fourth Amendment, was "clever but wrong." *Id.* at *24. The Court, thus, declined to solely examine the Consent Form itself and instead looked to defendant's consent under the totality of the circumstances by analyzing the defendant's interaction with law enforcement both before and after signing the form.

The scope of the consent is dispositive in determining whether the search was permissible. *United States v. Gray*, 834 Fed. App'x. 146, 150 (6th Cir. 2020) (citing *United States v. Garrido-Santana*, 360 F.3d 565, 575 (6th Cir. 2004) (stating that the scope of the consent given determines the permissible scope of the search)). "The standard for measuring the scope of a person's consent is objective reasonableness." *Gray*, 834 Fed. App'x at 150 (citing *Florida v. Jimeno*, 500 U.S. 248, 251 (1991)). Thus, the Court will consider the words, gestures, and conduct of the individual providing consent, and then inquire how a reasonable person would have understood the exchange between him and law enforcement. *Id.* (citing *United States v. Lucas*, 640 F.3d 168, 175 (6th Cir. 2011)).

The Sixth Circuit has addressed the reasonableness of the consensual search of a private

computer in the child pornography context most recently in *Lucas*. There, too, the defendant signed a broad consent to search form.[6] The defendant provided written consent to law enforcement to search the residence for evidence of illegal controlled substances. *Lucas*, 640 F.3d at 171. Police discovered marijuana plants in the defendant's closet and digital photographs on a personal camera which depicted marijuana usage. *Id.* Upon the belief that defendant's personal computer would contain further evidence of drug use or possession, police searched the computer and discovered images that appeared to be child pornography. *Id.* at 172. The Sixth Circuit affirmed the district court's finding that police had not exceeded the scope of the defendant's consent. *Id.* at 178. The court emphasized that police had found child pornography unintentionally while carrying out a lawful search for evidence of drug use or possession. Another determining factor was that the defendant could have revoked, withdrawn, or limited his consent at any time and chose not to do so.

Here, the object of the search of Mr. Lewis' residence was, irrefutably, to find evidence of child exploitation. "Generally, the expressed object of the search defines the scope of that search." *Garrido-Santana*, 360 F.3d at 576. Detective Gatson's testimony that he informed Mr. Lewis of the reason for their knock-and-talk is not disputed. Thus, the record currently reflects that Mr. Lewis was well-aware of the object of the investigation: child sex exploitation. A reasonable person under these circumstances would deduce that the object of the search would be to find evidence of child sex exploitation. Detective Gatson's statements to Mr. Lewis regarding the purpose of the knock-and-talk are compounded by the terms of the Consent Form itself, which authorizes a "complete search" of the premises and property at 147 Meredith Avenue. The Consent

---

[6] The form in *Lucas* appears to be even narrower than the Consent Form signed by Mr. Lewis. It stated that, "[b]y signing the form, Lucas agreed that the officers could search his residence for illegal controlled substances, drug paraphernalia, and "other material or records pertaining to narcotics." *Lucas*, 640 F.3d at 171. Here, Mr. Lewis broadly consented to law enforcement performing a "complete search" of the property at 147 Meredith Avenue. [R. 26-2]

Form lists two of Mr. Lewis' electronic devices, but the terms do not limit the search to those items exclusively. As in *Lucas*, Mr. Lewis maintained the right to withdraw or limit the scope of the consensual search. The record does not reflect any assertion from Mr. Lewis that he withdrew or attempted to withdraw his consent.

During the Suppression Hearing, counsel for Mr. Lewis alluded to Mr. Lewis' refusal to waive his *Miranda* rights upon his arrest as evidence of an implied withdrawal of consent. However, an arrest does not result in an automatic withdraw of consent. *United States v. Mitchell*, 82 F.3d 146, 150–51 (7th Cir. 1996) ("[T]he fact that [the defendant] formally was placed under arrest sometime after the first consent does not work as an automatic withdrawal of the consent previously given."); *see also United States v. Mendez*, 431 F.3d 420, 427 (5th Cir. 2005) (adopting Seventh Circuit rule that an individual being placed under arrest does not result in the automatic revocation of consent). Mr. Lewis' desire to preserve his rights under *Miranda* does not suggest a desire to withdraw, revoke, or limit the prior consent.

Another issue raised at the Suppression Hearing is whether the scope of Mr. Lewis' consent to search extended beyond the "preview" performed by FE Rollins to a full forensic examination of Mr. Lewis' devices. The scope of a consent as to a search "is generally defined by its expressed object[.]" *United States v. Lucas*, 640 F.3d 168, 176 (6th Cir. 2011) (quoting *Florida v. Jimeno*, 500 U.S. 248, 251 (1991)). "[T]he standard for measuring the scope of a suspect's consent under the Fourth Amendment is 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Id.* For instance, in *Jimeno*, the Court determined that it was objectively reasonable for the consensual search of a vehicle to also encompass the consensual search of a closed container when the defendant was aware of the object of the police's search (controlled substances). *Jimeno*, 500 U.S. at 251–252. Similarly, the Sixth Circuit upheld a search of a vehicle where police moved seats and opened

containers, where the defendant only consented to law enforcement to "look through" or "go through" the vehicle. *United States v. Canipe*, 569 F.3d 597, 604–05 (2009). There, the Court determined that the defendant's "general consent . . . reasonably included permission to search any container that may have contained illegal objects." *Id.* at 606.

Here, the interactions between Detective Gatson, Special Agents Minnick and Even, and Mr. Lewis evince circumstances which would lead a reasonable person to believe a "complete search" of 147 Meredith Avenue would not be limited to a simple "preview" of Mr. Lewis' electronic devices. This is supported by Detective Gatson's credible testimony that he informed Mr. Lewis of the purpose of the knock-and-talk and that they were investigating child sex exploitation. By informing Mr. Lewis of the object of their investigation, Detective Lewis thereby informed Mr. Lewis of the scope of a potential search. Then, Mr. Lewis provided a valid and sweeping consent to search his residence, memorialized by the Consent Form. Under these circumstances, a reasonable person would have understood that the consent to a "complete search" would include methods beyond a mere preview of electronic devices. Thus, absent withdrawal, revocation, or limitation of consent by Mr. Lewis, the undersigned finds that law enforcement did not exceed the scope of Mr. Lewis' consent when it conducted its search of Mr. Lewis' devices.

Based on the totality of circumstances, including Mr. Lewis' cooperation with law enforcement and the passage of time between Mr. Lewis signing the Consent Form and the execution of the search warrant (12:40 P.M. and 3:18 P.M. respectively), the undersigned finds that the Consent Form signed by Mr. Lewis was not revoked, withdrawn, or limited. Accordingly, the search and seizure of property at 147 Meredith Avenue was not violative of the Fourth Amendment and its fruits need not be suppressed. Having established that Mr. Lewis consented to the search, the Court need not address whether the search warrant lacked probable cause and, in

turn, whether a good-faith exception applied to the warrant.

## V. RECOMMENDATION

For the above reasons, it is **RECOMMENDED** that the Defendant's Motion to Suppress [R. 24] be **DENIED**.

*** *** *** ***

The parties are directed to 28 U.S.C. § 636(b)(1) for a review of appeal rights governing this Recommended Disposition. Particularized objections to this Recommended Disposition must be filed within fourteen days from the date of service thereof or further appeal is waived. *United States v. Campbell*, 261 F.3d 628, 632 (6th Cir. 2001); *Thomas v. Ann*, 728 F.2d 813, 815 (6th Cir. 1984). General objections or objections that require a judge's interpretation are insufficient to preserve the right to appeal. *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004); *Miller v. Currie*, 50 F.3d 373, 380 (6th Cir. 1995). A party may file a response to another party's objections within fourteen days after being served with a copy thereof. 28 U.S.C. § 636(b)(1)(C); FED. R. CRIM. P. 59(b)(1).

Signed January 11, 2022.



Signed By:
*Edward B. Atkins*   EBA
**United States Magistrate Judge**